**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| GEOSCOPE TECHNOLOGIES PTE. LTD., <br><br> Plaintiff, <br><br> vs. <br><br> GOOGLE LLC, <br><br> Defendant. | Civil Action No. 1:22-cv-01331-MSN-JFA <br><br> **JURY TRIAL DEMANDED** |
| GEOSCOPE TECHNOLOGIES PTE. LTD., <br><br> Plaintiff, <br><br> vs. <br><br> APPLE INC., <br><br> Defendant. | Civil Action No. 1:22-cv-01373-MSN-JFA <br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE
PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)**

**TABLE OF CONTENTS**

I.    Introduction ........................................................................................................................1

II.   Procedural Posture .............................................................................................................2

III.  Background of the Patents-in-Suit ....................................................................................3

    A.    The '104 Family ......................................................................................................3

    B.    The '753 Patent .......................................................................................................4

    C.    The '784 Patent .......................................................................................................6

    D.    The '264 Patent .......................................................................................................7

IV.   Legal Standard ...................................................................................................................8

    A.    Judgment on the Pleadings Under Fed. R. Civ. P. 12(c) .........................................8

    B.    Patent Eligibility Under 35 U.S.C. § 101 ...............................................................9

    C.    Presumption of Validity ........................................................................................10

V.    Argument ..........................................................................................................................11

    A.    The '104 Family is Patent-Eligible Under Alice ..................................................11

    B.    The '753 Patent is Patent-Eligible Under Alice ...................................................24

    C.    The '784 Patent is Patent-Eligible Under Alice ...................................................31

    D.    The '264 Patent is Patent-Eligible Under Alice ...................................................36

VI.   Conclusion .......................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    882 F.3d 1121 (Fed. Cir. 2018)................................................................................ *passim*

*Adasa Inc. v. Avery Dennison Corp.*,
    55 F.4th 900 (Fed. Cir. 2022) .................................................................9, 17, 28, 31

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
    573 U.S. 208 (2014)................................................................................ *passim*

*Automated Tracking Solutions, LLC v. Coca-Cola Co.*,
    723 F. App'x 989 (Fed. Cir. 2018) ........................................................................22

*Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016)............................................................................10

*BSG Tech LLC v. Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018)............................................................................21

*California Institute of Technology v. Broadcom Ltd.*,
    25 F.4th 976 (Fed. Cir. 2022) ............................................................................23

*CardioNet, LLC v. InfoBionic, Inc*,
    955 F.3d 1358 (Fed. Cir. 2020)................................................................................ *passim*

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
    927 F.3d 1306 (Fed. Cir. 2019)..............................................................................10, 11, 20

*Cisco Systems, Inc. v. Uniloc 2017 LLC*,
    813 F. App'x 495 (Fed. Cir. 2020)........................................................................39

*Copperative Entertainment, Inc. v. Kollective Technology, Inc.*,
    50 F.4th 127 (Fed. Cir. 2022) ............................................................................10, 20, 21, 31

*Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*,
    880 F.3d 1356 (Fed. Cir. 2018)............................................................................14

*CosmoKey Solutions GmbH & Co. KG v. Duo Security LLC*,
    15 F.4th 1091 (Fed. Cir. 2021) ............................................................................21, 36

*Diamond v. Diehr*,
    450 U.S. 175 (1981).............................................................................. *passim*

*Dropbox, Inc. v. Synchronoss Technologies, Inc.*,
   815 F. App'x 529 (Fed. Cir. 2020) ..................................................................................13

*Electric Power Group, LLC v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016)..................................................................................16, 30

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016).................................................................................. *passim*

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
   942 F.3d 1143 (Fed. Cir. 2019)............................................................................10, 12, 16, 18

*McRO, Inc. v. Bandai Namco Games America Inc.*,
   837 F.3d 1299 (Fed. Cir. 2016)...................................................................................14

*Mentone Solutions LLC v. Digi International Inc.*,
   Nos. 2021-1202, 2021-1203, 2021 WL 5291802 (Fed. Cir. Nov. 15, 2021)...........................35

*Microsoft Corp. v. i4i Ltd. Partnership*,
   564 U.S. 91 (2011)....................................................................................................10

*Netgear, Inc. v. Ruckus Wireless, Inc.*,
   5 F. Supp. 3d 592 (D. Del. 2013).................................................................................39

*Occupy Columbia v. Haley*,
   738 F.3d 107 (4th Cir. 2013) ......................................................................................9

*Packet Intelligence LLC v. NetScout Systems, Inc.*,
   965 F.3d 1299 (Fed. Cir. 2020)..........................................................................12, 14, 19

*Sanderling Management Ltd. v. Snap Inc.*,
   65 F.4th 698 (Fed. Cir. 2023) ................................................................................28, 29

*SRI International, Inc. v. Cisco Systems, Inc.*,
   930 F.3d 1295 (Fed. Cir. 2019)................................................................................ *passim*

*Thales Visionix Inc. v. United States*,
   850 F.3d 1343 (Fed. Cir. 2017).................................................................................. *passim*

*Trustees of Columbia University in City of New York v. Symantec Corp.*,
   425 F. Supp. 3d 601 (E.D. Va. 2019) ........................................................................ *passim*

*Uniloc USA, Inc. v. LG Electronics USA, Inc.*,
   957 F.3d 1303 (Fed. Cir. 2020)................................................................................. *passim*

*Visual Memory LLC v. NVIDIA Corp.*,
   867 F.3d 1253 (Fed. Cir. 2017)........................................................................14, 17, 33, 34

iii

*Weisner v. Google LLC*,
     51 F.4th 1073 (Fed. Cir. 2022) .........................................................................................34

**Statutes**

35 U.S.C. § 101............................................................................................................... *passim*

35 U.S.C. § 282.............................................................................................................................10

**Rules**

Fed. R. Civ. P. 12........................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)...............................................................................................8, 21

Fed. R. Civ. P. 12(c) ...................................................................................................... *passim*

Plaintiff Geoscope Technologies Pte. Ltd. ("Geoscope") hereby opposes Defendants Google LLC ("Google") and Apple Inc.'s ("Apple") Rule 12(c) Motion for Judgment on the Pleadings (Dkt. No. 93 (Google Action) and Dkt. No. 83 (Apple Action), "Motion" or "Mot.").

## I.    INTRODUCTION

Technological improvements to known problems are patent-eligible. Controlling precedent confirms this for the electrical and computer arts as for any other, even though those improvements may, *e.g.*, be software-based, comprise novel data structures, or involve the processing and analysis of data. If a patent claims a technological improvement, that ends the *Alice* inquiry.

Defendants' reflexive § 101 challenge—curiously filed as a Rule 12(c) motion in the middle of expert discovery, and without record support—commits the classic fallacy of over-abstracting the claimed inventions in search of an abstract concept to argue the Patents-in-Suit are invalid. The Supreme Court and Federal Circuit have repeatedly admonished against this approach, recognizing that *any* invention can be dissected to find an alleged abstract idea. That is not the *Alice* test. Rather, the controlling test is whether the patent claims *as written*—and as informed by the patent specification—cover a technological improvement, or merely an abstract idea.

The specifications of the Patents-in-Suit—as well as the averments in Geoscope's Complaints that must be accepted here as true—detail specific technological challenges to geolocating mobile devices, and explain how the claimed inventions solve those challenges. They improve geolocation technology itself by, *inter alia*, correcting for biases in outdoor versus indoor environments, defining grid points based on measured signal propagation rather than a fixed or conventional geography, correcting measurement bias to align calibration data with ground truth, and using ambient signals for geolocation so that bandwidth, sensors, and battery can be more efficiently utilized. These are specific technological improvements to geolocation—they are not mere uses of geolocation for implementing a business method or economic activity, or other

abstract idea. Even if the claims were drawn to an abstract concept—which they are not—they would, at a minimum, be patent-eligible under the second step of the *Alice* test, since they include inventive concepts and unconventional approaches as to how geolocation is performed.

All inventions are built on prior components and involve abstract ideas. That alone cannot render a claim patent-ineligible. The correct inquiry is whether the claims as a whole cover abstract ideas, or rather recite technological improvements. The Patents-in-Suit do the latter—they claim specific technological improvements for performing geolocation. Defendants cannot meet their burden to show otherwise by clear and convincing evidence. Thus, the Motion should be denied.

## II.    PROCEDURAL POSTURE

Geoscope filed its Complaints against Google and Apple on November 22, 2022 and December 1, 2022, respectively, for infringement of the same six patents. Although not consolidated, some proceedings have been conducted jointly (*e.g.*, *Markman*) and some filings (*e.g.*, briefings for this Motion) are filed identically in both matters. The parties served opening expert reports on July 3, 2023, and rebuttal reports are due on July 28, 2023. *See* Dkt. No. 91 (Google Action). The joint *Markman* hearing for both cases was held on July 6, 2023. Discovery closes in both cases on August 18, 2023.

Defendants first approached Geoscope regarding this Motion on June 8, 2023, many months after answering the Complaints. Geoscope said that, given the imminent expert exchanges, it would be better to address the issue on a full record at summary judgment. Nonetheless, Defendants filed the Motion on June 27, 2023. Less than a week later, on July 3, 2023, Defendants served expert reports addressing, *e.g.,* "the conventionality of the elements of the asserted claims" as part of a purported "ineligibility analysis." Geoscope's expert will also opine on the issue as part of his July 28, 2023 rebuttal report. As discussed below, however, the expert testimony cannot be considered because Defendants raised these arguments in a Rule 12(c) motion.

## III.    BACKGROUND OF THE PATENTS-IN-SUIT

### A.    The '104 Family

The asserted '104, '358, and '494 Patents are all part of the same patent family (the "'104 Family"[1]). Geoscope asserts that Defendants infringe claims 1 and 2 of the '104 Patent, claims 15, 18, and 52 of the '358 Patent, and claims 1, 4, 25, 26, and 35 of the '494 Patent. The '104 Family claims are directed to methods and systems for determining the location of a mobile device that involve, *inter alia*, modifying observed network measurement data.

Conventional geolocation systems using network signals were subject to reduced accuracy due to disparities between calibration data and observed data. Dkt. No. 1-1 ('104 Patent) at 1:33-40, 3:43-49, 9:35-39[2]; Dkt. No. 1 ¶¶ 49-50[3]. These disparities can be caused by a number of "varying conditions and other operational variables" that affect how signals propagate, including the environment in which the data is acquired (*e.g.*, indoors or outdoors). *Id*. For example, "the signal strengths of signals received from … neighboring base stations [by wireless devices located indoors] tend to be lower than the strength of the signals received by [those] located outdoors," resulting in "a poor estimated location accuracy." *Id*. This problem was common given that "[c]alibration data is typically collected in an outdoor environment" but mobile devices seeking their location may often be indoors. *Id.* Collecting calibration data indoors was not an acceptable solution to this problem because it is "time-consuming to perform calibration procedures indoors due to the required access to buildings and the inability to utilize automated collection procedures designed for outdoor environments." Dkt. No. 1-1 ('104 Patent) at 1:24-32; Dkt. No. 1 ¶ 53.

The inventions of the '104 Family improved on conventional methods for geolocation

---

[1] Where possible, Geoscope has endeavored to use the same naming conventions as Defendants.
[2] For simplicity, citations are to the '104 Patent; identical language is in the '358 and '494 Patents.
[3] The portions of the Complaints discussing the background of the Patents-in-Suit are identical (with identical paragraph numbering) for the Google and Apple Actions.

using network signals by modifying the observed data to account for these disparities. As the '104 Family explains, "[observed] network measurement data may be modified for comparison with the outdoor calibration data" as part of "[r]eliably locating a mobile station located indoors, even when the calibration data has been obtained in an outdoor environment." Dkt. No. 1-1 ('104 Patent) at 3:43-49; Dkt. No. 1 ¶ 51. The '104 Family claims recite this technological improvement to conventional geolocation systems that improves the accuracy of geolocation. Dkt. No. 1 ¶¶ 54-57. The '104 Family extensively describes exemplary forms of modifying the observed data prior to comparison to the calibration data. *Id*. ¶ 51.

The applicants for the '104 Family patents identified this problem in the prior art while prosecuting the patents before the United States Patent & Trademark Office ("USPTO"). *Id.* ¶ 50. For example, during prosecution of the '358 Patent, the applicants explained: "When a mobile station is located indoors, the signal strength of signals received and/or transmitted by the mobile station have the tendency to be lower than the strength of the signals received by a mobile station located outdoors. As a result of these lower signal strengths, geo-location efforts which rely on signal strengths may result in unsatisfactory location accuracy." *Id.* The applicants for the '104 Family patents also identified this aspect of the inventions to the USPTO as distinguishing prior art. *Id.* ¶ 52. For example, during prosecution of the '358 Patent, the applicants explained that prior art references relied on by the Examiner failed to teach, *inter alia*, "modifying the observed network measurement data and comparing the modified network measurement data with a database of calibration data to determine the location of a mobile station." *Id.*

**B.     The '753 Patent**

Geoscope asserts that Defendants infringe claims 1 and 32 of the '753 Patent. The '753 Patent claims are directed to methods and systems for determining the location of a mobile device that involve, *inter alia*, generating "grid points" based on calibration data and using those grid

4

points to geolocate a mobile device.

Conventional geolocation systems used signals associated with known locations to try to locate mobile devices. Dkt. No. 1 ¶ 59. Where these known locations were relatively sparse throughout a region resulting in limited information to be used for geolocation, the accuracy and efficiency of geolocation of mobile devices could suffer. *Id*. The further a mobile device was from a known location, the greater the uncertainty and error for the determination of its location. *Id*. Thus, the accuracy and efficiency of geolocation was diminished by not having more known locations associated with network data. *Id*. The '753 Patent explains that "there is a need to streamline the process in order to efficiently and effectively handle the vast amount of data being sent between the wireless communications network and the large number of mobile devices for which locations are to be determined." Dkt. No. 1-4 ('753 Patent) at 2:21-26; Dkt. No. 1 ¶ 59.

The inventions of the '753 Patent improved on conventional methods for geolocation using network signals by employing the generation and use of "grid points," including non-uniform grid points, as part of the determination of the location of a mobile device. Dkt. No. 1-4 ('753 Patent) at 9:34-48; Dkt. No. 1 ¶ 60. Using this approach, calibration data could be used to create a denser "map" of known locations associated with network data that could be used to locate a mobile device, ensuring more accurate geolocation with simpler calculations. *Id*. Then, "[t]he location of a wireless mobile device may be estimated by comparing data reported by the mobile device to be geolocated with the data … associated with the various grid points to thereby estimate the location of the mobile." *Id*. The '753 Patent explains how grid points can be generated based on calibration data. *See, e.g.,* Dkt. No. 1-4 ('753 Patent) at 10:29-11:21, 12:15-67; Dkt. No. 1 ¶ 60.

The applicants for the '753 Patent pointed to these inventive features in distinguishing the prior art during prosecution of the patent before the USPTO. Dkt. No. 1 ¶ 61. For example, the

5

applicants explained that, *inter alia*, in a prior art reference relied on by the Examiner "no grid points are generated within any geographic region" despite "[t]he claim [of the '753 Patent] specifically requir[ing] both calibration points and grid points." *Id.*

### C.    The '784 Patent

Geoscope asserts that Defendants infringe claim 11 of the '784 Patent, which depends from claim 1. The '784 Patent claims are directed to methods and systems for generating a calibration database that involve, *inter alia*, using data about the locations of streets to verify and improve calibration data that can be used for geolocation.

Conventional geolocation systems could suffer from reduced accuracy due to errors and imprecision in the calibration data used for geolocation caused by a variety of factors. Dkt. No. 1-5 ('784 Patent) at 1:28-37, Abstract; Dkt. No. 1 ¶ 65. For example, "[c]alibration data measured via a calibration data collection device may contain errors due to the physical limitations of the collection device and/or the collection process," including errors related to "signal degradation or drop-out" for GPS signals. *Id.* "Without accurate ground truth information, the calibration database will contain significant errors which will in turn be reflected by poor location estimates." *Id.* This problem was not resolved by alternative approaches such as the use of a "dead-reckoning device," which attempts to calculate location "when GPS location signaling obtained from a GPS satellite becomes unavailable," because that approach still results in calibration data that is "unsatisfactory" for accurate geolocation. Dkt. No. 1-5 ('784 Patent) at 1:44-60; Dkt. No. 1 ¶ 68.

The inventions of the '784 Patent improved on conventional methods for geolocation by using the locations of streets in an area as supplemental information to check the integrity of the calibration data. Contrary to conventional systems, the '784 Patent employed this additional geographic information to assess and correct errors in the calibration data. The '784 Patent teaches that "[g]round truth data observed from a data collection device (i.e., a GPS receiver) may be

6

collected and stored in a calibration database and compared to a street database to modify and enhance the calibration data for increased accuracy … [which] may in turn provide more accurate location results." Dkt. No. 1-4 ('784 Patent) at 3:23-3:28; Dkt. No. 1 ¶ 66. In this way, a "street database may be used as a supplemental data source to compare and/or check the integrity of collected location data." *Id*. The '784 Patent describes specific, exemplary ways in which a "street database" can be used to check and correct errors in calibration data. *See, e.g.*, Dkt. No. 1-4 ('784 Patent) at 4:7-67; Dkt. No. 1 ¶ 66.

During prosecution of the '784 Patent, the Examiner recognized that the prior art failed to teach limitations of the claims directed to this novel method of using information about streets to correct errors in the calibration data. Dkt. No. 1 ¶ 67. For example, the Examiner stated that the prior art failed to teach "determining from said status a most likely one of said plural streets upon which said wireless device is located" and "determining said most likely street as a first one of said plural geographic locations," as recited in the independent claims of the '784 Patent. *Id*.

### D.    The '264 Patent

Geoscope asserts that Defendants infringe claims 13, 15, and 20 of the '264 Patent. The '264 Patent claims are directed to methods and systems for determining path loss value that involve, *inter alia*, allowing such a determination while the wireless device and receiver are actively communicating and without disabling any other communication channel.

The '264 Patent teaches that "conventional systems determine the path loss value by assigning a dedicated frequency channel to the wireless device and disabling interfering frequency channels within the wireless communication system … [which] requires revising the frequency use plan for the entire geographic area which is costly and inefficient." Dkt. No. 1-6 ('264 Patent) at 3:39-45; Dkt. No. 1 ¶ 72. This also interfered with how remaining channels could be used by a and could require disabling interfering channels, reducing the number of frequency channels

available for use. *Id.* Thus, the '264 Patent explains that "there is a need for a method and apparatus for assessing path loss without setting aside an otherwise active frequency channel or disturbing the frequency use plan." Dkt. No. 1-6 ('264 Patent) at 1:55-61; Dkt. No. 1 ¶ 72.

The inventions of the '264 Patent satisfied this need. They improved on conventional methods for determining path loss values for geolocation purposes by using "an existing channel engaged in active communication" for path loss measurements, which "obviates the need for a dedicated channel and a revised frequency use plan." Dkt. No. 1-6 ('264 Patent) at 3:51-60; Dkt. No. 1 ¶ 74. "By using an active communication channel, the path loss measurement can be conducted without disrupting an existing frequency use plan to allocate a specific frequency channel for path loss calculations" and "the results can be as reliable as using a dedicated frequency channel for beacon signaling." Dkt. No. 1-6 ('264 Patent) at 4:60-67; Dkt. No. 1 ¶ 74.

The applicants for the '264 Patent identified this problem in the prior art while prosecuting the patent before the USPTO. Dkt. No. 1 ¶ 73. For example, the applicants distinguished prior art systems that "require[d] a frequency channel dedicated to the path loss measurement," noting that this approach employed by conventional systems "require[d] revising a frequency use plan for the respective geographic area which is costly and inefficient." *Id.* The applicants relied on these inventive features in arguing for the patentability of the claims during prosecution. *Id.* ¶ 75. For example, the applicants told the USPTO that the prior art failed to teach determining path loss values "utilizing an active communications channel and/or using measurements from an active communications channel without disabling any other communications channel." *Id.*

## IV.    LEGAL STANDARD

### A.    Judgment on the Pleadings Under Fed. R. Civ. P. 12(c)

A Rule 12(c) motion for judgment on the pleadings is reviewed under the same standard as a Rule 12(b)(6) motion to dismiss. *Trs. of Columbia Univ. in City of New York v. Symantec*

8

*Corp.*, 425 F. Supp. 3d 601, 608 (E.D. Va. 2019) (quoting *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013)). "[F]or purposes of the court's consideration of the Rule 12(c) motion, all of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false." *Trs. of Columbia*, 425 F. Supp. 3d at 608. Additionally, the Court must view all inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Id*.

### B.     Patent Eligibility Under 35 U.S.C. § 101

Broadly, under 35 U.S.C. § 101, "any new and useful process, machines, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore." One of the few exclusions is that "abstract ideas" cannot be patented. The test for that exclusion is governed by a two-step framework set forth by the Supreme Court in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l,* 573 U.S. 208, 217 (2014). Under *Alice* Step One, courts "determine whether the claims at issue are directed to a patent-ineligible concept," such as an "abstract idea." *Id.* at 218. If not, then the claims are patent-eligible under § 101, and the analysis ends there. *Id*. at 217; *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908 (Fed. Cir. 2022) ("If the focus of the claim is a specific and concrete technological advance, for example an improvement to a technological process or in the underlying operation of a machine, our inquiry ends and the claim is eligible.").

Courts must "tread carefully" to focus on the specific claimed solution rather than high-level simplifications because "[a]t some level, 'all inventions … embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* Additionally, courts must look to the patent's specification to inform their understanding of the claims in determining what they are "directed to." *CardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358, 1368 (Fed. Cir. 2020); *Enfish, LLC v. Microsoft Corp.,* 822 F.3d 1327, 1335 (Fed. Cir. 2016). Claims directed to improvements in technological processes are not abstract, and thus are patent-eligible. *Diamond v. Diehr*, 450

9

U.S. 175, 187-88 (1981); *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017); *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150 (Fed. Cir. 2019).

Claims that do not meet *Alice* Step One are still patent-eligible under *Alice* Step Two if they include an "inventive concept," such as "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice,* 573 U.S. at 217-18. "The 'inventive concept' may arise in one or more of the individual claim limitations or in the ordered combination of the limitations." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC,* 827 F.3d 1341, 1349 (Fed. Cir. 2016). The "inventive concept" can be found in "the non-conventional and non-generic arrangement of known, conventional pieces." *Id.* at 1350. Therefore, the "inquiry requires more than recognizing that each claim element, by itself, was known in the art." *Id.* at 1349.

"[P]atent eligibility may be resolved at the Rule 12 stage only if there are no plausible factual disputes after drawing all reasonable inferences from the intrinsic and Rule 12 record in favor of the non-movant." *Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022). Patentee's "specific, plausible factual allegations about why aspects of its claimed inventions were not conventional" must be accepted as true, and are enough to overcome a patent eligibility challenge under Rule 12(c). *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317–18 (Fed. Cir. 2019). "[P]lausible factual allegations may preclude dismissing a case under § 101 where, for example, 'nothing on th[e] record … refutes those allegations.'" *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).

## C.    Presumption of Validity

Patents are presumed valid. 35 U.S.C. § 282. As such, an accused infringer has the burden of proving invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). The presumption of validity and the "clear and convincing" burden of proof

apply to challenges to patent eligibility under § 101. *See Cellspin*, 927 F.3d at 1319; *Trs. of Columbia*, 425 F. Supp. 3d at 612.

## V.    ARGUMENT

### A.    The '104 Family is Patent-Eligible Under *Alice*

#### i.    The '104 Family Claims are Not Directed to an Abstract Idea

The '104 Family is directed to technological improvements in geolocation. The claims "improve[] an existing technological process," and thus are patent-eligible. *Alice*, 573 U.S. at 223.

Disparities between calibration data collected outdoors and measurements made indoors, as well as other disparities caused by "varying environmental circumstances," can "result in a poor estimated location accuracy" when geolocating mobile devices. Dkt. No. 1-1 ('104 Patent) at 1:33-40, 9:35-39; Dkt. No. 1 ¶¶ 49-50. These disparities occur because of "varying conditions and other operational variables" that can affect how signals propagate, including in indoor and outdoor environments. Dkt. No. 1-1 ('104 Patent) at 1:33-40, 9:35-39; Dkt. No. 1 ¶ 49. As the '104 Family explains, calibration data is "typically collected in an outdoor environment" because it is "time-consuming to perform calibration procedures indoors," *i.e.*, existing approaches at the time of the inventions failed to solve this technological challenge. Dkt. No. 1-1 ('104 Patent) at 1:24-32; Dkt. No. 1 ¶ 53. To solve the problem caused by these disparities, the '104 Family discloses and claims inventions directed to a specific technological improvement in geolocation systems—namely, modifying the measurements made by a mobile device to eliminate the disparities, improving the accuracy of geolocation. Dkt. No. 1-1 ('104 Patent) at 3:43-49; Dkt. No. 1 ¶¶ 51, 54-56.

Defendants' pithy assertion that these patents cover "the age-old concept of determining location" (Mot. at 1) ignores the actual inventions as claimed, as does Defendants' attempt to rewrite the claim limitations as merely "collecting", "modifying," or "comparing" data (*id.* at 7-8) without regard to what data is being collected, how it is collected, modified, and compared, or for

11

what purposes—all of which are set forth in the claims and informed by the specification. The Federal Circuit and Supreme Court have warned against and rejected the type of over-abstraction that is core to Defendants' Motion, recognizing that any invention can be reduced to an abstract concept when viewed through a fuzzy-enough lens. *Enfish*, 822 F.3d at 1337 ("[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.") (citing *Alice* and *Diehr*).

Under controlling precedent, the claims must be considered "as a whole" and "read [] in light of the specification" to assess whether they are directed to abstract ideas. *Packet Intel. LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1309 (Fed. Cir. 2020); *CardioNet*, 955 F.3d at 1368 ("We also consider the patent's written description, as it informs our understanding of the claims."). When viewed in this proper context, it is clear that the '104 Family claims are not directed to the abstract idea of "determining location based on data." as Defendants contend. Mot. at 7. Rather, they are directed to specific technological ***improvements*** to geolocation systems that change how geolocation is performed. *See Koninklijke*, 942 F.3d at 1150 ("Since *Alice*, we have found software inventions to be patent-eligible where they have made non-abstract improvements to existing technological processes.").

The Federal Circuit has repeatedly relied on a patent's characterization of the deficiencies in prior art systems, and how the claimed invention overcomes those deficiencies, in holding that a "claimed invention presented a technological solution to a technological problem." *Packet Intel.*, 965 F.3d at 1309-10; *see also, e.g., SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1303-04 (Fed. Cir. 2019); *CardioNet*, 955 F.3d at 1369-71 (holding that "the written description … confirms that the asserted claims are directed to a specific technological improvement" and "the district court erred by disregarding the written description's recitation of the advantages of the claimed

12

invention"). This principle is particularly applicable here, on a Rule 12 motion, because the Court "must construe all facts and draw all reasonable inferences"—including those related to the "advantages of the claimed invention"—in favor of Geoscope, especially because "there is no record evidence undermining the statements in the written description concerning the benefits" of the claimed inventions. *CardioNet*, 955 F.3d at 1371.

Defendants have not—and cannot—dispute these benefits, which are described in the '104 Family as well as the Complaints. Instead, Defendants largely disregard these disclosures, characterizing Geoscope's well-pleaded allegations as "conclusory legal assertions." Mot. at 35-36 (citing *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020)). But *Dropbox* is inapposite—the Federal Circuit found conclusory allegations that "restate the claim elements" insufficient to overcome dismissal. Here, Geoscope's Complaints includes several paragraphs ***with numerous quotes from the '104 Family and prosecution histories*** that go well-beyond the type of allegations rejected in *Dropbox*, particularly when read together and not in isolation based on Defendants' cherry-picked citations. *Compare* Mot. at 35 (purporting to summarize Dkt. No. 1 ¶ 48) *with* Dkt. No. 1 ¶¶ 48-57. No record evidence exists contrary to these pleaded and disclosed benefits of the '104 Family inventions. Defendants try to dismiss this record by arguing that inventive features described in the specification must be claimed to be considered. Mot. at 35-36. But the '104 Family claims do so—they recite the very "modifying" step that solved a particular challenge encountered by conventional geolocation systems.

The available record—the specification and the Complaints—confirm that the '104 Family claims fall squarely within the Supreme Court and Federal Circuit precedent holding that improvements to a technological process or system are patent-eligible. *See, e.g., Diehr*, 450 U.S. at 187-88 (holding claims reciting an improvement in the rubber curing process patent-eligible);

13

*Thales*, 850 F.3d at 1348-49 (holding claims reciting improvement to determining the position of an object patent-eligible); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1362 (Fed. Cir. 2018) (holding claims reciting improvement to mobile device user interfaces patent-eligible). This is equally true for software inventions and for claims that involve the use or manipulation of data or data structures. *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020); *Packet Intel.*, 965 F.3d at 1309-10; *SRI Int'l*, 930 F.3d at 1303-04; *Enfish*, 822 F.3d at 1337; *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259-60 (Fed. Cir. 2017); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016); *Trs. of Columbia*, 425 F. Supp. 3d at 612-14. And this is true even if the claims recite only conventional sensors, when their measurements are used in new or unconventional ways to improve a technological process. *Thales*, 850 F.3d at 1348-49; *Diehr*, 450 U.S. at 187-88.

Even going back to *Alice* and its consideration of intermediated financial settlement on a computer, the crux of the analysis is whether the claims—in view of the specification—***improve*** a technological system or process, or merely use such a system or process in the pursuit of an abstract concept. That was the holding in *Alice*, that using a computer to perform a financial transaction was not an improvement to the computer itself. As explained above, the '104 Family claims do not merely use geolocation in pursuit of a business method—they directly ***improve*** geolocation systems and processes by providing a specific technological solution to a technological problem.

The '104 Family claims are similar to those found to be patent-eligible in *Thales*. There, the Federal Circuit found claims directed to a "particular configuration of inertial sensors and a particular ***method of using the raw data from the sensors***" patent-eligible because they allowed "more accurately calculat[ing] the position and orientation of an object on a moving platform." *Thales*, 850 F.3d at 1349 (emphasis added). The inertial sensors were conventional hardware but

14

the unconventional use of them enabled new measurements and new uses of data, resulting in an improvement to existing technology for locating objects. *Id*. at 1345, 1348-49. As such, the Federal Circuit found the claims to be "nearly indistinguishable from the claims at issue in *Diehr*," where the Supreme Court found patent-eligible a computer-controlled process that used an otherwise conventional "temperature measurement" at a specific location to control heating inputs. *Id.* at 1348 (addressing *Diehr*, 450 U.S. 175 (1981)). The '104 Family claims similarly use existing hardware (*e.g.*, "transmitters") and data in a new way to improve the geolocation of mobile devices. Like the new use of "raw data from the sensors" in *Thales*, the "modifying" in the '104 Family constituted a new use of data that directly addressed a technological problem in conventional geolocation systems to improve their accuracy. *See* Dkt. No. 1-1 ('104 Patent) at 1:33-40, 3:43-49, 9:35-39; Dkt. No. 1 ¶¶ 49-52. Whether the claims of the '104 Family recite "data and [] components" that were "known in the art," as Defendants contend (Mot. at 9), is irrelevant because the claims are directed to particular configurations and methods of using such data and components that ***improve*** geolocation. *See Thales*, 850 F.3d at 1349.

Defendants' challenges to the '104 Family are unavailing. Defendants rewrite each limitation of claim 1 of the '358 Patent to purported "functions" regarding "data," improperly overgeneralizing them (*see Enfish*, 822 F.3d at 1337), rather than assessing the limitations as written. Mot. at 7-8. Under Defendants' flawed approach, any claim involving software or data could be rewritten similarly despite the fact that the Federal Circuit has "routinely held software claims patent eligible under *Alice* step one when they are directed to improvements to the functionality of a computer or network platform itself." *Uniloc*, 957 F.3d at 1307.

After rewriting the claims to improperly oversimplify them, Defendants then seek to analogize the rewritten claims to case law regarding "collecting, analyzing, and outputting data."

Mot. at 8. But there are fatal flaws in Defendants' analysis. *First*, Defendants do not even attempt to show how the claims in the '104 Family are similar to the claims in their cited cases, relying merely on words copied out of context without regard to the actual holding of those cases. Nor do Defendants explain ***why*** the claims in their cited cases were found to be directed to abstract ideas. In fact, Defendants do little more than provide a laundry list of abstract ideas that says nothing about the inquiry here—how do you determine what a claim is "directed to," and whether the '104 Family claims themselves are directed to abstract ideas. *See* Mot. at 8-10. In other words, not only do Defendants disregard the claims of the '104 Family as written, they also disregard the claims in the cases they cite. Defendants cannot meet their burden of proving patent ineligibility by clear and convincing evidence with such a cursory analysis.

*Second*, Defendants' cases are inapposite because they involve claims that—unlike the '104 Family claims—are directed to the mere use of existing technology to collect and analyze data ***without improving a technological process***. Defendants focus on *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), in which the claims were directed to "a process of gathering and analyzing information of a specified content [*i.e.*, electric power grid data], then displaying the results, ***and not any particular assertedly inventive technology for performing those functions***." *Id.* at 1354 (emphasis added). The Federal Circuit explained that the "focus of the claims is not on [] an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools." *Id.* Many relevant cases have distinguished *Electric Power* for these reasons. *See SRI*, 930 F.3d at 1304 ("The *Electric Power* claims were drawn to using computers as tools to solve a power grid problem, rather than improving the functionality of computers and computer networks themselves."); *Koninklijke*, 942 F.3d at 1152.

Thus, the Federal Circuit did not broadly hold that claims that involve analyzing,

16

collecting, and outputting data are patent-ineligible. Defendants disregard the key limiting principle that such claims may be patent-eligible as long as they are directed to an improvement in an existing technological process. *See, e.g., SRI*, 930 F.3d at 1303 (finding claims involving collecting and analyzing network traffic data to be patent-eligible because they were "directed to a technological solution to a technological problem"); *Visual Memory*, 867 F.3d at 1259. This principle also distinguishes *Automated Tracking Sols.*, *CalAmp Wireless Networks*, and *GeoComply Sols*. *See* Mot. at 8-9. All of these cases involved claims that were directed to the general concept of locating objects. The '104 Family claims, however, do more than use existing geolocation techniques to locate a device—the claims directly ***improve*** geolocation technology by using data in a new way to make geolocation more accurate.

Defendants also contend that "the Federal Circuit has made clear that merely modifying or manipulating data itself is an abstract concept." Mot. at 9. But this is subject to the same limiting principle explained above—if the manipulation of data is an improvement to a technological process, it is still patent-eligible. In *Uniloc*, the Federal Circuit found patent-eligible a claim reciting transmission of "an additional data field for polling at least one secondary station." 957 F.3d at 1305-06. The specification explained that the invention "improves conventional communication systems by including a data field for polling as part of the inquiry message, thereby allowing primary stations to send inquiry messages and conduct polling simultaneously." *Id*. The challenger characterized the addition of a data field as mere "data manipulation" but the Federal Circuit rejected this because—despite the clams involving data manipulation and transmission— "the claimed invention changes the normal operation of the communication system itself to 'overcome a problem specifically arising in the realm of computer networks,'" relying on disclosures in the specification. *Id*. at 1308; *see also Adasa*, 55 F.4th at 909 (finding claims relating

17

to the use of an "additional data field" patent-eligible); *Enfish*, 822 F.3d at 1339 (finding claims relating to a "type of data structure" patent-eligible). The Federal Circuit also rejected the challenger's assertion that the claims must "expressly mention" the advantages of the claimed invention. *Uniloc*, 957 F.3d at 1309.

As in *Uniloc*, the '104 Family claims involve data manipulation and transmission but are not **directed to** these concepts. Rather, they are directed to an improvement in a technological process—*i.e.*, geolocation. Similar to *Uniloc*, the '104 Family claims "change[] the normal operation" of geolocation systems to "overcome a problem specifically arising in [that] realm." *Uniloc*, 957 F.3d at 1308. The modification of "observed network measurement data" in the '104 Family claims is not ancillary to claimed invention—it is a novel, unconventional step that directly overcomes a problem in conventional geolocation systems related to disparities between calibration data and observed data. This is described in the '104 Family itself as well as in the Complaints. Dkt. No. 1-1 ('104 Patent) at 1:24-40, 3:43-49; Dkt. No. 1 ¶¶ 49-56. These facts— which must be taken as true on this Rule 12 motion (*CardioNet*, 955 F.3d at 1369-71)—further distinguish Defendants' cases finding that different patents with different claims and different specifications—none of which were analyzed in detail by Defendants—were patent-ineligible. *See* Mot. at 9-10. And *Uniloc* confirms that the '104 Family claims need not expressly recite the advantages of the claimed invention, as Defendants contend. *See* Mot. at 5, 10.

Defendants assert that the '104 Family claims fail to specify how the steps of the claims occur (Mot. at 10), apparently seeking to impose a far higher burden than is required by the law. In *Koninklijke*, the Federal Circuit found that a dependent claim reciting no more than "wherein the varying device is further configured to modify the permutation in time" was "sufficiently specific" to be a patent-eligible improvement. *Koninklijke*, 942 F.3d at 1148, 1150-51. In *Packet*

18

*Intel.*, the Federal Circuit endorsed its decision in *SRI* affirming the patent eligibility of claims related to analyzing network traffic data despite "the *SRI* claims recit[ing] general steps for network monitoring **with minimal detail present in the claim limitations themselves**." *Packet Intel.*, 965 F.3d at 1309 (discussing *SRI*, 930 F.3d 1295) (emphasis added). In *Trs. of Columbia*, this Court found that a claim "specifying that 'the model is a combined model created from at least two models created using different computers'" was specific enough to cover a patent-eligible improvement described in the specification (the "creation of unique models"), despite providing no further details about how the models were created. *Trs. of Columbia*, 425 F. Supp.3d at 612-14. In fact, the defendant in *Trs. of Columbia* made the same argument that Defendants make here, contending that "without specifying a particular algorithm or model, the [] patent claims must be directed to an abstract idea." *Id.* at 616 n.25. The Court **rejected** the argument, finding that the claims did not have to be limited to a "specified algorithm or pathway to create a model" to be patent-eligible. *Id.* (citing *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018)). The Court should make the same determination here.

Even the broadest claims of the '104 Family sufficiently describe how the claimed steps occur and how they relate to one another. For example, the claims explain what data is collected, what data is modified, and how the modifications relate to the final determination of location. If any legitimate doubt existed as to the nature of these steps, Defendants presumably would have raised such issues at claim construction. They did not. And the narrower independent claims and dependent claims (*see infra* § V.A.iii) provide even more detail, further demonstrating that Defendants are improperly holding the '104 Family claims to an unwarranted level of specificity.

### ii.   Even if Directed to an Abstract Idea, the '104 Family Claims Include an Inventive Concept

Even if the '104 Family claims were directed to an abstract idea—which they are not—at

a minimum, they include inventive concepts that render the claims patent-eligible under *Alice* Step Two. The *Alice* Step Two test is whether the elements of the claims, considered individually ***and*** as an ordered combination, recite something not well-understood, routine, or conventional. *Aatrix*, 882 F.3d at 1128. This determination is a fact-based inquiry. *Id*.

As described above, the '104 Family explains that modifying observed network measurement data overcomes problems in conventional geolocation systems resulting from disparities in calibration data and observed data that may cause "poor estimated location accuracy." Dkt. No. 1-1 ('104 Patent) at 1:24-40, 1:50-54. And the '104 Family further explains why alternatives, such as collecting calibration data indoors, are insufficient. *Id*. The Complaints expand on this, with supporting citations from the '104 Patent and the prosecution histories. Dkt. No. 1 ¶¶ 48-57. Thus, at a minimum, Geoscope has plausibly alleged that the '104 Family claims' recitation of modifying observed network measurement data was not well-understood, routine, or conventional, and constitutes an inventive concept. *See Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 131-36 (Fed. Cir. 2022) (reversing district court's dismissal of complaint under § 101 because patentee plausibly alleged inventive concepts based on "claim language, the written description, and the amended complaint").

On Defendants' Rule 12 motion, this fact-based inquiry as to whether claim elements are well-understood, routine, or conventional "cannot be answered adversely to the patentee based on the sources properly considered … such as the complaint, the patent, and materials subject to judicial notice." *Aatrix*, 882 F.3d at 1128. Indeed, the Federal Circuit has repeatedly found error in district courts not accepting statements in the patent specification and patentee's complaint as true when addressing § 101 in the context of Rule 12 motions. *Cellspin Soft*, 927 F.3d at 1316-20 ("The district court erred by not accepting Cellspin's well-pleaded allegations as true with respect

20

to whether its patents capture, transfer, and publish data in a way that is plausibly inventive."); *Coop. Ent.*, at 131-36 ("Determining whether the claimed network is well-understood, routine, or conventional is a question of fact that cannot be resolved at the Rule 12(b)(6) stage, and the district court erred in resolving this factual issue against Cooperative."); *Aatrix*, 882 F.3d at 1128-30 ("We vacate the district court's dismissal pursuant to Rule 12(b)(6). There are factual allegations in the second amended complaint, which when accepted as true, prevent dismissal pursuant to Rule 12(b)(6)."). If the Court reaches *Alice* Step Two, it should similarly find that the factual record here warrants denial of Defendants' Motion.

Rather than attempt to engage with the fact-based *Alice* Step Two inquiry, Defendants gloss over it by contending that every limitation in the '104 Family claims is "part of the abstract idea," and thus "cannot add an inventive concept." Mot. at 11 (citing *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018)). In *BSG*, the Federal Circuit explained that "[i]f a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG*, 899 F.3d at 1290-91. However, the inventive concept in the '104 Family claims is not the application of the abstract idea—which is, according to Defendants, "determining location based on data" (Mot. at 7)—using conventional techniques. Instead, the inventive concept is an ***unconventional*** approach to resolving disparities between calibration data and observed data that reduces the accuracy of geolocation, which renders the claims patent-eligible. *See, e.g.*, *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1098 (Fed. Cir. 2021) (reversing the district court and finding claims reciting "a specific improvement to authentication that increases security" patent-eligible under *Alice* Step Two where "nothing in the specification or anywhere else in the record" suggested that certain claim steps were conventional).

21

Defendants do not explain how "modifying said observed network measurement data"—much less the ordered combination of all the claimed steps—is part of "determining location based on data." Mot. at 11. Nor could Defendants do so, which appears to be why they only address this with a single conclusory sentence (*see id.*), because the '104 Family describes this step as something done specifically to overcome problems in conventional geolocation systems. Dkt. No. 1-1 ('104 Patent) at 1:24-40, 1:50-54; Dkt. No. 1 ¶¶ 49-50. In other words, the fact that conventional geolocation systems "determin[ed] location based on data" **without modifying** **"observed network measurement data"** indicates that this step cannot be part of that abstract idea. Defendants cannot meet their burden to demonstrate the '104 Family claims are patent-ineligible by clear and convincing evidence with conclusory assertions that miss the mark.

### iii.    Defendants Have Not Demonstrated Representativeness and Their Arguments Regarding Additional Claims Fail

Defendants contend that claim 1 of the '494 Patent, the broadest of the asserted claims of the '104 Family, is representative of all of the asserted '104 Family claims. Mot. at 6-7. Defendants provide Appendices A and B showing the language of these claims but otherwise do not explain their assertion of representativeness. Instead, Defendants rely on *Automated Tracking Sols.* but, in that case, the parties agreed on the representative claims. *Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F. App'x 989, 991-93 (Fed. Cir. 2018). Geoscope does not agree that claim 1 of the '494 Patent is representative of the other asserted '104 Family claims at least because, as further explained below, other claims include additional limitations that directly refute arguments Defendants have made about why the '104 Family claims are patent-ineligible.

Defendants address the narrower asserted independent and dependent claims of the '104 Family superficially at best. *See* Mot. at 10, 12-14. These narrower claims are patent-eligible for at least the same reasons explained above (*see supra* §§ V.A.i-ii) in addition to other reasons. For

example, Defendants argue that the broadest asserted claim of the '104 Family is patent-ineligible because it purportedly does not explain how the data is modified. Mot. at 10. Geoscope explained above why that is incorrect. But, at a minimum, Defendants' argument does not apply to the claims of the '104 Family that recite modifying observed network measurement data using an "average value" or "greater magnitude signal characteristic."[4] These claims plainly describe how the data is modified. So Defendants instead contend that these claims recite "abstract mathematical concepts" and are patent-ineligible on that basis. Mot. at 10. But claims containing mathematical concepts may be patent-eligible where they ***implement or apply the concept*** "in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect." *Thales*, 850 F.3d at 1347-48 (quoting *Diehr*, 450 U.S. at 192); *California Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 988 (Fed. Cir. 2022). These claims in the '104 Family are not directed to the general concepts of "averaging and comparing values," but rather to a particular implementation of these concepts in a geolocation system, which is permissible.

Defendants' assertions as to dependent claims reciting "non-uniform grid points" and that "one of the data transmitters be outside the network" (Mot. at 13-14) are similarly unavailing. As to the former, Defendants completely disregard the meaning and purpose of "grid points" as used in the Patents-in-Suit.[5] Although the parties dispute the construction of "grid points," there is no dispute that it is more than a grid but that is what Defendants rely on to somehow assert these claims are not patent-eligible. Mot. at 13-14. As to the latter, the claims relate to a particular

---

[4] Either expressly or through dependence on an independent claim, asserted claims 25, 26, and 35 of the '494 Patent as well as asserted claim 52 of the '358 Patent recite the former, and asserted claims 1 and 2 of the '104 Patent recite the latter.

[5] Geoscope has explained the flaws in Defendants' arguments for claims reciting "grid points" further in connection with the '753 Patent, where "grid points" are more prominently featured, but those same points apply here as well. *See infra* § V.B.i.

configuration—even if the transmitters are conventional, the configuration is not and a new configuration of conventional hardware is patent-eligible. *Thales*, 850 F.3d at 1348-49.

**B.    The '753 Patent is Patent-Eligible Under *Alice***

**i.        The '753 Patent Claims are Not Directed to an Abstract Idea**

Defendants' arguments for the '753 Patent have many of the same core flaws described above in connection with the '104 Family. For example, Defendants do not meaningfully address the '753 Patent's discussion of the claimed invention's benefits and how it improves conventional geolocation systems. Defendants again overgeneralize the claims. And Defendants again fail to meaningfully explain how the cases they cite support their argument. But in addition to all of that, Defendants mischaracterize what "grid points" are, despite this being a key issue addressed during claim construction. Thus, the Court should deny Defendants' Motion as to the '753 Patent.

Conventional geolocation systems suffered from having a limited number of known locations associated with network data that could be used to geolocate a mobile device at an unknown location. Dkt. No. 1 ¶ 59. These known locations might be sparse in an area, resulting in the only known location being relatively far from a mobile device. *Id*. This could diminish the accuracy of geolocation and require mobile devices to operate more inefficiently to try to overcome this challenge by using sophisticated hardware and significant processing power. *Id*. As the '753 Patent explains, "there is a need to streamline the process in order to efficiently and effectively handle the vast amount of data being sent between the wireless communications network and the large number of mobile devices for which locations are to be determined." Dkt. No 1-4 ('753 Patent) at 2:21-26; Dkt. No. 1 ¶ 59. To solve this problem, the '753 Patent discloses and claims inventions directed to a specific technological improvement in geolocation systems—generating "grid points," including non-uniform ones, using calibration data so that particular grid points can be selected and used to geolocate a mobile device. Dkt. No. 1-4 ('753 Patent) at 9:34-48, Abstract;

24

Dkt. No. 1 ¶ 60. In this way, calibration data could be used to create a denser "map" of known locations associated with network data that could be used to locate a mobile device. *Id*.

As with the '104 Family, Defendants improperly fail to meaningfully address these points in the '753 Patent and the Complaints despite their importance to the *Alice* test, particularly in the context of Rule 12 motions. *CardioNet*, 955 F.3d at 1369-71; *see also supra* § V.A.i. When viewed in light of this record, it is apparent that the claims of the '753 Patent are not directed to the abstract ideas of "organizing data" and "determining location based on data," as Defendants assert. Mot. at 16. To the contrary, the claims are directed to specific technological **improvements** in conventional geolocation systems that suffered from a particular problem, as described above. There is no record evidence "undermining" these benefits of the '753 Patent claims, and they must be taken as true on this Rule 12 motion. *CardioNet*, 955 F.3d at 1371.

Defendants again ask the Court to turn a blind eye to these disclosures, cherry-picking individual paragraphs and sentences from the Complaints and mischaracterizing what was pleaded. Mot. at 36-37. For example, Defendants argue that benefits flowing from the generation and use of "non-uniform grid points" for geolocation are irrelevant because the asserted claims purportedly "do not even mention" non-uniform grid points. *Id*. But the claims recite grid points and non-uniform grid points are indisputably a type of grid point disclosed by the '753 Patent (*see* Dkt. No. 1-4 ('753 Patent) at 9:40-43)—indeed, Defendants stressed this **repeatedly** at the recent *Markman* hearing. *See* July 6, 2023 Hr'g Tr. at 25:15-19, 88:6-17, 148:20-149:8.

Defendants also repeat their inappropriate exercise of rewriting the claims "at such a high level of abstraction" that their subsequent analysis fails to address the claims as written. *Enfish*, 822 F.3d at 1337. Defendants' rewrite is even more egregious for the '753 Patent than it was for the '104 Family. For example, Defendants characterize three very different limitations as all doing

25

no more than "analyzing data" (Mot. at 17), underscoring just how "untethered from the language of the claims" their arguments are. *Enfish*, 822 F.3d at 1337. And, critically, Defendants' characterization of the "generating … grid points" limitation as merely "organizing data" (Mot. at 17) is contradicted by the '753 Patent's description of grid points. The '753 Patent expressly teaches that "calibration data for [various points] must be gathered and analyzed *so that particular points (e.g., 'grid points') within the geographic can be determined and associated with a particular set or sets of calibration data*." Dkt. No. 1-4 ('753 Patent) at 2:31-35 (emphasis added). In addressing this language, Defendants tellingly crop out the portion about *determining* grid points from calibration data. *See* Mot. at 14. Defendants presumably do this to obscure the fact that generating grid points is not merely "organizing data"— grid points are something new that must be determined from the analysis of calibration data, and the Federal Circuit has repeatedly found that new data structures are patentable subject matter, as discussed below. Defendants' attorney argument cannot overwrite the express disclosures in the '753 Patent.

Thus, Defendants' argument fails at least because it rests on this false premise that generating grid points is simply organizing data. Defendants reiterate this inaccurate characterization throughout the Motion, contending that "the claims recite nothing more than the idea of compiling different types of data into a collection against which new data (for unknown locations) can be compared" and the claims "require nothing more than organizing reference data into a database … and then determining a geographic location based on information stored in that database." Mot. at 15, 17. Not only do these assertions misrepresent what generating grid points constitutes, they also ignore limitations directed to "evaluating" and "selecting" the grid points as part of an improved process for geolocating mobile devices.

That the claimed inventions of the '753 Patent involve the analysis and organization of data

26

does not render them patent-ineligible. To the contrary, the Federal Circuit has found that claims involving these things are patent-eligible as long as they are directed to improving a technological system or process, just as the '753 Patent claims are. In *SRI*, the Federal Circuit found that claims involving analyzing network traffic data to detect suspicious activity were patent-eligible because they were "not directed to just analyzing data," but rather "an improvement in computer network technology." *SRI*, 930 F.3d at 1303. This is because the claims were not merely "using a computer as a tool—that is, automating a conventional idea on a computer." *Id*. at 1304. Instead, the claims "improve[d] the technical functioning of the computer and computer networks by reciting a specific technique for improving computer network security." *Id*. The Federal Circuit relied extensively on the specification's discussion of the benefits of the claimed invention and problems with conventional networks to determine that "the claims are directed to a technological solution to a technological problem." *Id*. at 1303-04.

The '753 Patent claims are analogous to those in *SRI* and patent-eligible for the same reasons. Although the '753 Patent claims involve analysis of data to generate grid points and determine the location of mobile devices, they are not directed just to that analysis of data. Instead, the claims set out a specific set of steps that, as supported by the specification, provide a technological solution to a technological problem faced by conventional geolocation systems. In short, the claims are not merely "automating a conventional idea on a computer"—they recite an ***unconventional*** idea to ***improve*** geolocation of mobile devices.

In *Enfish*, the Federal Circuit found claims directed to a "data storage and retrieval system" to be "directed to a specific improvement to the way computers operate" by claiming a "type of data structure designed to improve the way a computer stores and retrieves data in memory." *Enfish*, 822 F.3d at 1336-39. The Federal Circuit explained that the district court had

oversimplified the claims by finding they were directed to "the concept of organizing information using tabular formats." *Id*. at 1337-38. Although the claims involved the organization of data, that did not make them patent-ineligible because the claimed data structure improved an existing technological process. Again, the Federal Circuit relied on the specification's discussion of the benefits of the claimed invention. *Id*. at 1337.

These same principles were applied to find patent-eligible claims directed to a "data structure focused on improvements to the technological process by which that data is encoded" (*Adasa*, 55 F.4th at 908-09) and the creation and use of a "new type of model that improves the efficiency of computer virus screening" (*Trs. of Columbia*, 425 F.Supp.3d at 616). The same principles in *Enfish*, *Adasa*, and *Trs. of Columbia* are applicable here. The '753 Patent claims are directed to the generation, evaluation, selection, and use of new data structures to overcome challenges faced by conventional geolocation systems. Even if that involves the analysis and organization of data, that alone cannot render the claims patent-ineligible.

Just as they did with the '104 Family, Defendants cite a number of cases with high-level parentheticals that indicate a court found the claims at issue in those cases to be directed to abstract ideas. *See* Mot. at 16-18. But Defendants do not attempt to explain why the claims at issue in those cases were found to be directed to abstract ideas or how those cases show that the particular claims in the '753 Patent are also directed to abstract ideas, which is the relevant inquiry here. The only exception is *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698 (Fed. Cir. 2023), for which Defendants provide limited additional argument. Mot. at 16-17. *Sanderling*, however, addressed a "method of distributing a digital image processing function" that was directed to "the use of computers as a tool" instead of a "specific improvement in computer functionality." *Sanderling*, 65 F.4th at 701-03. As the Federal Circuit found, the claims recited no more than providing

information related to digital image processing in response to meeting a condition. *Id.* at 703. The claim did not involve the generation of any new data structure, nor did it involve any improvement to digital image processing. *Id.* And, contrary to more analogous cases like *SRI* and *Enfish*, the Federal Circuit did not identify anything in the patent specification supporting that the claims were directed to an improvement to a technological process. *Id.*

Thus, the claims in *Sanderling* are not analogous to the '753 Patent claims which involve the generation of grid points and—as supported by the record—provide a specific improvement to conventional geolocation systems. Defendants also argue that the '753 Patent claims do not provide enough specificity with respect to a number of aspects of the claims. But, as discussed in connection with the '104 Family, Defendants overstate what the law requires. *See supra* § V.A.i (discussing cases that address the requisite level of specificity for claims). The '753 Patent claims adequately recite how the claimed invention operates, including how the various limitations relate to one another in order to improve conventional geolocation systems.

### ii.   Even if Directed to an Abstract Idea, the '753 Patent Claims Include an Inventive Concept

Even if the '753 Patent claims were directed to an abstract idea—which they are not, as discussed above—they include inventive concepts that render the claims patent-eligible under *Alice* Step Two. As explained above, the record here demonstrates that the '753 Patent claims—which recite generating grid points that can be selected and used for geolocation—overcame a problem in conventional systems related to the sparseness of known locations and network data that could be used to geolocate a mobile device, and this problem could result in diminished accuracy and efficiency of geolocation. Dkt. No 1-4 ('753 Patent) at 2:21-50; Dkt. No. 1 ¶¶ 58-63. In view of this record and because this is a Rule 12 motion, the Court should resolve the fact-based inquiry underlying *Alice* Step Two—whether the elements of the claims, taken individually or as

an ordered combination, recite something not well-understood, routine or conventional—in Geoscope's favor. *Aatrix*, 882 F.3d at 1128; *see also supra* § V.A.ii (citing cases involving *Alice* Step Two in the context of Rule 12 motions). Nothing in the record contradicts or undermines these statements in the '753 Patent specification or in Geoscope's well-pleaded allegations.

Defendants rely on *Electric Power*, in which the Federal Circuit found no inventive concept in claims directed to power-grid monitoring because they "do not even require a new source or type of information, or new techniques for analyzing it." Mot. at 18-20. The Federal Circuit further explained that the *Electric Power* claims "do not require an arguably inventive set of components or methods, such as measurement devices or techniques, that would generate new data." *Elec. Power Grp.* 830 F.3d at 1355. Unlike *Electric Power*, the '753 Patent claims use an ***unconventional*** approach to geolocation—based on new techniques involving generating grid points—to improve geolocation systems. At a minimum, the generation and use of the novel grid points of the Patents-in-Suit is inventive because conventional geolocation systems did ***not*** employ those steps and, as a result, had reduced accuracy and efficiency.

Moreover, Defendants' *Alice* Step Two arguments are flawed—at least with respect to the "generating … grid points" limitation—because Defendants recast this limitation as "merely … reorganizing the initially collected data." Mot. at 19. This is an improper characterization of the limitation that runs afoul of what the '753 Patent actually discloses for the reasons explained above in connection with *Alice* Step One. *See supra* § V.B.i. And Defendants' argument that "the claims do not place any limitation on *how* the set of grid points should be generated" (Mot. at 19) is irrelevant—the generation and use of the claimed grid points for geolocation is ***itself*** something unconventional and inventive. Dkt. No 1-4 ('753 Patent) at 2:21-50; Dkt. No. 1 ¶¶ 58-63.

Finally, Defendants do not even attempt to address whether there is an inventive concept

in the "ordered combination" of the '753 Patent claim elements, despite that being a necessary part of the *Alice* Step Two inquiry. *Coop. Ent.*, 50 F.4th at 130. This is fatal to Defendants' argument, particularly here where there are important relationships between limitations of the '753 Patent claims with respect to how the grid points are generated, evaluated, selected, and used for geolocation. Defendants cannot meet their burden to prove these claims are patent-ineligible by clear and convincing evidence while failing to perform the proper *Alice* Step Two analysis.

### C.   The '784 Patent is Patent-Eligible Under *Alice*

#### i.   Claim 11 of the '784 Patent is Not Directed to an Abstract Idea

Claim 11—the only asserted claim of the '784 Patent—is directed to a specific approach to using data about the locations of streets to verify and improve calibration data used for geolocation of mobile devices, thereby improving the accuracy of geolocation. Because the particular technological advance of claim 11 "improved an existing technological process," it is patent-eligible. *Alice*, 573 U.S. at 223; *Adasa*, 55 F.4th at 908.

Conventional geolocation systems were susceptible to errors in calibration data that could reduce the accuracy of geolocation relying on that data. As the '784 Patent explains, "[c]alibration data measured via a calibration data collection device may contain errors due to the physical limitations of the collection device and/or the collection process," including "signal degradation or drop-out … due to poor satellite visibility or high dilution of precision (DOP)." Dkt. No. 1-5 ('784 Patent) at 1:28-37, Abstract; Dkt. No. 1 ¶ 65. "Without accurate ground truth information, the calibration database will contain significant errors which will in turn be reflected by poor location estimates." Dkt. No. 1-5 ('784 Patent) at 1:30-33; Dkt. No. 1 ¶ 65. The '784 Patent also explains that conventional approaches to addressing this problem via a "dead-reckoning device," which "attempt[s] to calculate the location of the vehicle when GPS location … becomes unavailable," are "unsatisfactory" because they may further exacerbate errors in the calibration

31

data. Dkt. No. 1-5 ('784 Patent) at 1:44-60; Dkt. No. 1 ¶ 68. To solve this problem more effectively, the '784 Patent discloses and claims a technological improvement in geolocation systems by using data about the locations of streets to "ensure the integrity of the calibration data after it has been collected." Dkt. No. 1-5 ('784 Patent) at 1:66-2:9, 3:23-4:28; Dkt. No. 1 ¶¶ 65-67, 69.

As explained previously, the specification's discussion of the problems with conventional geolocation systems and how the claimed invention overcomes those problems—along with the related allegations in the Complaints—are critically important to the patent eligibility inquiry. *See supra* § V.A.i. This is particularly true in the context of Rule 12 motions, as the Court must construe all facts and draw all reasonable inferences in favor of Geoscope. *Id.* The record here evidences that claim 11 of the '784 Patent is not directed to the abstract ideas of "associating observed location data with known points on a map" or "collect[ing] data in databases," as Defendants contend. Mot. at 23-24. Instead, the claim is directed to specific improvements in how geolocation systems overcome the particular challenge described above.

Defendants recognize that the '784 Patent explains that the claimed inventions are directed to solving this problem encountered by conventional geolocation systems. *See* Mot. at 21, 24. Unable to dispute this as a factual matter, Defendants instead argue that the "language of the claim, however, is not limited to correcting likely errors in data collected about a wireless device; no such concept is claimed" and "the claim itself recites no such limitation that specifically requires this … goal." *Id.* The Federal Circuit has rejected this same argument that "the claims themselves must expressly mention the [benefit] achieved by the claimed system," ruling that "[c]laims need not articulate the advantages of the claimed combinations to be eligible." *Uniloc*, 957 F.3d at 1309. Defendants elevate form over substance in contending that Geoscope's allegations about the inventiveness of the '784 Patent are "irrelevant" because "the claims do not recite using

32

supplemental street information to generate a more accurate database of calibration data." Mot. at 37. This technological advantage is *a result* of the specific steps of the claimed method—it flows from the claimed invention and need not be expressly recited to be considered.

Despite the claimed method requiring several specific steps laying out how supplemental street information is used to correct calibration data entered into a database, Defendants boil the claim down to "associating observed location data with known points on a map" and "collect[ing] data in databases." Mot. at 23-24. This is the type of oversimplification of claims that is contrary to Supreme Court and Federal Circuit law. *Enfish*, 822 F.3d at 1337 (citing *Alice* and *Diehr*). Claim 11—as written—involves the collection and association of data but it is directed to specific *improvements* in geolocation systems that improve their accuracy.

Claim 11 is similar in this regard to the claims found patent-eligible in *Visual Memory*. There, the Federal Circuit reversed the district court's ruling that the claims were directed to the "abstract idea of categorical data storage." *Visual Memory*, 867 F.3d at 1257-59. Although the "concept of categorical data storage underlies the [challenged] claims" and the claims used "conventional computer components," neither of those facts demonstrated that the claims were directed to an abstract idea. *Id*. at 1262. Relying heavily on the patent specification, the Federal Circuit found the claims were directed to a "technological improvement" system related to computer memory. *Id*. at 1258-60 ("And like the patents at issue in *Enfish* and *Thales*, the specification discusses the advantages offered by the technological improvement."). The claims did not "merely recite the 'use of an abstract mathematical formula on any general purpose computer,' 'a purely conventional computer implementation of a mathematical formula,' or 'generalized steps to be performed on a computer using conventional computer activity,'" and thus were patent-eligible. *Id*. at 1260. The same is true of claim 11 of the '784 Patent—although it

33

involves data storage and conventional components, it is ***directed to*** an improved way of correcting calibration data to overcome problems encountered by conventional geolocation systems. As described above, this is set forth in detail in the '784 Patent. Claim 11 recites a specific set of steps that constitute a "technological improvement," and go beyond the categories of patent-ineligible inventions identified in *Visual Memory*. *Id*.

Defendants again cite a number of cases for high-level propositions that amount to a list of abstract ideas. But Defendants fail to explain how these cases relate to or demonstrate that claim 11 of the '784 Patent is directed to an abstract idea. For example, Defendants rely on *Weisner v. Google LLC*, 51 F.4th 1073 (Fed. Cir. 2022) for the proposition that "claims involving collecting or analyzing data for the purpose of detecting location are patent ineligible." Mot. at 25. *Weisner* is readily distinguishable—there, the specification, claims, and patentee's own statements indicated that the claims were directed to mere "automation or digitization" of conventional activity. *Weisner*, 51 F.4th at 1082-83. Moreover, the patentee could not point to anything in the specification identifying the benefits of the claimed invention over conventional systems. *Id*. at 1083. Claim 11 of the '784 Patent, on the other hand, does not automate conventional activity, but rather provides an unconventional approach to correcting calibration data to solve problems in the art, and the benefit of this is extensively described in the specification.

Further, Defendants assert that claim 11 recites only "functional claim language like 'determining,' 'obtaining,' and 'entering'" that is "results-oriented." Mot. at 27-28. But claim 11 describes precisely how points from a "location information database" are, through a series of steps, entered into a calibration database based on associations with collected calibration data. Defendants broadly contend that the words "determining," "obtaining," and "entering" amount to "functional language" but do not explain why. The Federal Circuit has found that similar words

like "receiving," "monitoring," and "transmitting" were not merely functional language. *Mentone Sols. LLC v. Digi Int'l Inc.*, Nos. 2021-1202, 2021-1203, 2021 WL 5291802, at *2, *5 (Fed. Cir. Nov. 15, 2021). Defendants' superficial word-matching exercise to recast the claim language as "functional" and "results-oriented" should be rejected.

### ii.   Even if Directed to an Abstract Idea, Claim 11 of the '784 Patent Includes an Inventive Concept

Claim 11 of the '784 Patent is not directed to an abstract idea but, even if it were, it includes an inventive concept rendering it patent-eligible under *Alice* Step Two. As explained above, the record here demonstrates that claim 11 is directed to an improved, unconventional approach to correcting errors in calibration data using points in a "location information database" to overcome a problem in geolocation systems that was not resolved by conventional alternatives like "dead reckoning." Dkt. No. 1-5 ('784 Patent) at 1:28-2:9, 3:23-4:28; Dkt. No. 1 ¶¶ 65-67, 69. Using this inventive approach results in more accurate calibration data, and thus more accurate location estimates when geolocating mobile devices. *Id*. Based on this record and because this is a Rule 12 motion, the Court should resolve the fact-based inquiry underlying *Alice* Step Two—whether the elements of the claims, taken individually or as an ordered combination, recite something not well-understood, routine, or conventional—in Geoscope's favor. *Aatrix*, 882 F.3d at 1128; *see also supra* § V.A.ii (citing cases involving *Alice* Step Two in the context of Rule 12 motions). Nothing in the record contradicts or undermines these statements in the '784 Patent specification or in Geoscope's well-pleaded allegations.

Defendants argue there is no inventive concept, focusing on "conventional technology" and the "categories of data" employed by claim 11. *See* Mot. at 28-29. This misses the point. The "particular arrangement of steps" in a claim can be what "provides a technical improvement" over conventional systems, especially where "the specification emphasizes the inventive nature of these

steps." *CosmoKey*, 14 F.4th at 1099. That is precisely the case here. Claim 11 recites a particular arrangement of steps that provide a technological improvement to conventional geolocation systems by enabling a new way to check and correct collected calibration data. The '784 Patent specification emphasizes that these steps are inventive, overcome a problem faced by conventional geolocation systems, and that the claimed method is superior to alternative approaches to addressing this problem. Dkt. No. 1-5 ('784 Patent) at 1:28-2:9, 3:23-4:28; Dkt. No. 1 ¶¶ 64-70. This is sufficient to find that claim 11 includes an inventive concept and deny Defendants' Motion, particularly in the context of this Rule 12 motion. *Aatrix*, 882 F.3d at 1128.

### D. The '264 Patent is Patent-Eligible Under *Alice*

#### i. The '264 Patent Claims Are Not Directed to an Abstract Idea

Defendants allege that the '264 Patent claims are directed to the abstract idea of "using an existing communication channel to determine signal loss." Mot. at 31. Even this language, which refers to specific technological activity, demonstrates Defendants' difficulty in framing the claims as abstract. Contrary to Defendants' assertion, the '264 Patent claims are directed to improvements in a technological process for determining path loss for geolocation of mobile devices.

At the time of the invention, "conventional systems determine[d] the path loss value by assigning a dedicated frequency channel to the wireless device," which interfered with how remaining channels could be used and could reduce the number of frequency channels available for use. Dkt. No. 1-6 ('264 Patent) at 1:55-61, 3:39-45; Dkt. No. 1 ¶ 72. As explained in the '264 Patent, "[d]edicating a specific channel for path loss measurements"—as conventional systems did—"and rearranging the remaining channels on the frequency use plan to accommodate the path loss-dedicated frequency channel is both costly and inefficient." *Id*. To address this deficiency in conventional systems, the inventions of the '264 Patent use "an existing channel engaged in active communication" for path loss measurements, which "obviates the need for a dedicated channel

36

and a revised frequency use plan." Dkt. No. 1-6 ('264 Patent) at 3:51-60; Dkt. No. 1 ¶ 74. As a result, "the path loss measurement can be conducted without disrupting an existing frequency use plan" and "the results can be as reliable as using a dedicated frequency channel for beacon signaling." Dkt. No. 1-6 ('264 Patent) at 4:60-67; Dkt. No. 1 ¶ 74.

Thus, the '264 Patent describes using an active communication channel—without disabling any other communication channel—to determine path loss values as a specific *improvement over conventional systems*. This record is critical to the inquiry as the Federal Circuit routinely relies on such descriptions in the specification to find that claims are patent-eligible under *Alice* Step One. *CardioNet*, 955 F.3d at 1369-71; *see supra* § V.A.i. Despite this, Defendants only address this language in the specification in a cursory manner. Mot. at 30.

The record demonstrates that the '264 Patent claims are directed to specific technological improvements in conventional systems that provide concrete benefits, and accordingly the claims are patent-eligible. The claims recite the very feature that the specification describes as an inventive improvement over conventional systems—namely, "identifying a first frequency channel *in an active communication* between the wireless device and the receiver *without disabling any other communication channel*" as part of determining a path loss value, which occurs in subsequent limitations. Dkt. No. 1-6 ('264 Patent) at claim 13 (emphasis added). Defendants argue this is insufficient because the claims purportedly do not specify how the frequency channel is identified. Mot. at 32. That is irrelevant—the specification makes clear that the using an active communication channel rather than using a "dedicated frequency channel … and disabling interfering frequency channels" is a technological improvement over conventional systems, and that is what is claimed. Dkt. No. 1-6 ('264 Patent) at 3:39-45; Dkt. No. 1 ¶ 72. Moreover, despite arguing that the claims do not have the requisite level of specificity, Defendants

37

fail to identify what would suffice or how more detail could be provided. Instead, they hold the claims to a standard far beyond what is required for patent eligibility—just as they did for the other Patents-in-Suit—as explained previously. *See supra* § V.A.i (discussing cases that address the requisite level of specificity for claims).

The '264 Patent claims are analogous to those found patent-eligible in *Thales*. In *Thales*, the Federal Circuit found patentable a novel configuration of otherwise conventional hardware (inertial sensors) to enable new measurements that improved existing technology for tracking objects. *Thales*, 850 F.3d at 1348-49. The Federal Circuit explained that using this existing hardware and the "raw data from the sensors" in a "non-conventional manner" to improve a technological process was sufficient to confer patent eligibility. *Id*. Additionally, the Federal Circuit found the claims in *Thales* "nearly indistinguishable from the claims at issue in *Diehr*," which are also analogous to the claims here. *Id.* at 1348. In *Diehr*, the Supreme Court found patentable a computer-controlled process that used an otherwise conventional "temperature measurement" in a new configuration wherein the measurement was taken at a specific location for the purpose of controlling heating inputs. *Diehr*, 450 U.S. at 175-177, 187. Like in *Thales* and *Diehr*, although the '264 Patent claims use conventional components (*e.g.*, "wireless devices" and "receivers"), the components and the data from them are used in a new way that is a specific technological improvement to conventional processes for determining path loss.

As with the other Patents-in-Suit, Defendants cite cases with high-level parentheticals, or no parentheticals, that indicate a court found the claims at issue in those cases to be directed to abstract ideas. *See* Mot. at 31-32. Again, Defendants fail to tie those cases to what is at issue here by explaining why those courts ruled the way they did or how the claims in those cases are similar to the ones here. As explained above, this is a fatal flaw in Defendants' argument as they have the

38

burden to prove patent ineligibility by clear and convincing evidence. In any event, Defendants' wireless networking cases (Mot. at 31) are inapposite as they broadly claim ranking or selecting network components without anything in the record beyond conclusory assertions of unconventionality. *See Cisco Sys., Inc. v. Uniloc 2017 LLC*, 813 F. App'x 495, 498-99 (Fed. Cir. 2020) (rejecting patentee's reliance on "sweeping conclusory statements" regarding patent eligibility); *Netgear, Inc. v. Ruckus Wireless, Inc.*, 5 F. Supp. 3d 592, 624 (D. Del. 2013) (pre-*Alice* decision applying an outdated legal standard). Further, Defendants disregard dependent claims 15 and 20, doing no more than showing what they recite and asserting—without explanation—that claim 13 is representative. Mot. at 30-31. This conclusory treatment cannot demonstrate these claims are patent-ineligible by clear and convincing evidence.

### ii.    Even if Directed to an Abstract Idea, the '264 Patent Claims Include an Inventive Concept

Even if the '264 Patent claims were directed to an abstract idea, they include inventive concepts that render the claims patent-eligible under *Alice* Step Two. As explained above, the '264 Patent specification and the Complaints describe at length how the claimed inventions overcame a problem in conventional systems for determining path loss. *See supra* § V.D.i. Whereas conventional systems used dedicated frequency channels for such determinations, the '264 Patent claims are directed to inventively using an active communication channel for such determinations so that no other frequency channels need to be disabled or rearranged, which is "both costly and inefficient." Dkt. No. 1-6 ('264 Patent) at 1:55-61, 3:39-60, 4:60-67; Dkt. No. 1 ¶¶ 71-77. There is no record evidence refuting these statements in the '264 Patent specification or in Geoscope's well-pleaded allegations about how this new approach was unconventional and inventive. Thus, the record on this Rule 12 motion is dispositive as to the fact-based inquiry underlying *Alice* Step Two—it demonstrates that the elements of the '264 Patent claims, taken individually or as an

39

ordered combination, recite something not well-understood, routine or conventional, and thus include an inventive concept. *Aatrix*, 882 F.3d at 1128; *see also supra* § V.A.ii.

Having no way to rebut this record, Defendants argue that "the identification of a frequency channel that is already in use" cannot be the inventive concept because it "is the abstract idea to which the claims are directed." Mot. at 33. This characterization of the inventive concept disclosed and claimed in the '264 Patent is inaccurate. It is not the mere identification of a frequency channel in use that the '264 Patent describes as inventive. Rather, it is the use of an active communication channel for path loss determinations so that no other frequency channels need to be disabled or rearranged. This is laid out expressly in the '264 Patent and Defendants' attempted rewrite of the specification should be rejected. Dkt. No. 1-6 ('264 Patent) at 1:55-61, 3:39-60, 4:60-67. This specific technological advance is not an abstract idea, but rather an improvement to how path loss determination systems operate.

## VI.    CONCLUSION

For the foregoing reasons, Defendants have failed to demonstrate by clear and convincing evidence that any of the asserted claims of the Patents-in-Suit are patent-ineligible. Accordingly, the Court should deny Defendants' Motion.

Dated: July 13, 2023

Respectfully submitted,

/s/ _____

John M. Erbach (VSB No. 76695)
Christopher W. Bascom (VSB No. 87302)
**SPOTTS FAIN, P.C.**
Renaissance Centre
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Tel: (804) 697-2044
Fax: (804) 697-2144
jerbach@spottsfain.com
cbascom@spottsfain.com

Timothy K. Gilman (*pro hac vice*)
Christopher M. Gerson (*pro hac vice*)
Saunak K. Desai (*pro hac vice*)
Natalie D. Lieber (*pro hac vice*)
Gregory R. Springsted (*pro hac vice*)
Ryan J. Singer (*pro hac vice*)
Alexandra J. Cho (*pro hac vice*)
**SCHULTE ROTH & ZABEL LLP**
919 Third Avenue
New York, NY 10022
Tel: (212) 756-2000
Fax: (212) 593-5955
tim.gilman@srz.com
chris.gerson@srz.com
saunak.desai@srz.com
natalie.lieber@srz.com
gregory.springsted@srz.com
ryan.singer@srz.com
alexandra.cho@srz.com

*Attorneys for Plaintiff*
*Geoscope Technologies Pte. Ltd.*

41